CYRUS CURRIER & SONS, a corporation,

*v.*

INTERNATIONAL MOLDERS' UNION OF NORTH AMERICA, LOCAL No. 40, et al.

[Decided July 21st, 1921.]

1. Where a defendant local union was an unincorporated organization, the unlawful acts of its financial secretary in persuading complainant's employes to enter the union and thereby break their contract of employment, and in using violence and intimidation in so doing, are chargeable to the union, and it may be enjoined by this court.

2. Where the complainant, in the exercise of its legal right, made a condition of employment that its employes should not join a labor union, and upon their joining discharged them, the soliciting of employes by persuasion, and in some cases by force and violence, to join a labor union with the intent to have them break their contract of employment, will be enjoined.

3. An employer has a legal right to hire men unaffiliated with a labor union, and to make continuance of unaffiliation a condition of employment.

On final hearing.

*Messrs. Pitney, Hardin & Skinner* (*Mr. Alfred F. Skinner*), for the complainant.

*Mr. John A. Matthews,* for the defendants.

BACKES, V. C.

The bill is to restrain the International Molders' Union, Local No. 40, its officers and agents, from picketing the complainant's foundry and interfering with its employes, and from soliciting them to join the union in violation of their agreement of service. The complainant employs in the neighborhood of one hundred men, of whom twenty-five, or thereabouts, are coremakers and molders. In March, 1917, the union called a strike of coremakers and molders employed in the various foundries in Newark, including the plant of the complainant, which was carried on by the usual method of picketing and oppression until halted by the injunction of this court. Thereafter, the complainant adopted a policy of excluding all union men from its service, and made it a condition of hire that its employes should not belong to or join labor unions while in its employ, and this policy it has followed ever since. In 1920 the union, Local No. 40, resumed picketing the complainant's plant, not in numbers as large as three years before, nor with the same degree of violent coercion and intimidation, nor for all the purposes for which the strike had been called. The object of the present picketing is to persuade the complainant's coremakers and molders to join the union in breach of the conditions of their employment, the ultimate object, obviously, being to unionize the complainant's shop, as part of the broader scheme of unionizing all foundries in Newark. The pickets stationed themselves daily near the complainant's plant and intercepted its employes, soliciting them to membership in their local, accompanying their solicitations with threats of violence, and sometimes with actual violence against

the reluctant and unwilling, and with such marked success that the coremakers and molders were reduced to five, thereby greatly hampering the complainant in carrying on its works. The defendants knew the condition of employment and that the complainant was conducting an "employer's closed shop," the antithesis of a "union closed shop," *i. e.,* one where unions, having the upper hand, tolerate no labor except that by union hands. The efforts of the defendants were not confined to soliciting members for their union, which, when accomplished, they knew would result in the members' discharge from complainant's employ, but their further effort was to foist upon the complainant these newly-made members, enjoining them to secrecy, with the aim to eventually unionize the complainant's shop.

The activities of the defendant union in and about the complainant's works were carried on by one Stevenson, its financial secretary, with whom was associated members of other locals of the Molders' Union. As to Stevenson's guilt of intimidation, violence and seduction of the complainant's employes, I have no doubt, notwithstanding his denial. He professes to have acted as an individual unionist and not as a representative of his local; but this is idle evasion. The defendant local is an unincorporated organization of men—a copartnership—bound together for the attainment of worthy objects, mutually beneficial, sometimes, unfortunately, sought to be obtained by unworthy means, and in the prosecution of their common object, the action of any one member is binding upon all; and so the conduct of Stevenson in behalf of the organization, and his methods, though obnoxious in the eyes of the law, are chargeable to the defendant local, and, indeed, as I read the answer of the defendants, the local, while specifically denying the representative capacity of Stevenson, does not shirk or seek to evade responsibility for his activities in its behalf. The joint answer of the union and its officers specifically denies the charges of intimidation and violence, but, collectively, they admit, with argumentative modification, the charges of picketing and the solicitation of the complainant's employes to membership in the organization and implicitly adopt all of Stevenson's efforts, charged and proved, lawful and unlawful, as their community efforts. Stevenson embodied the union.

The case as made manifestly calls for the intervention of the court, to the extent, at least, of the mandate in *Jonas Glass Co.* v. *Glass Bottle Blowers' Association,* *72 N. J. Eq. 653; affirmed,* *77 N. J. Eq. 219.*

The complainant asks more: That the defendants be re-strained from soliciting the complainant's employes to join the union with intent to have them breach their contract of service. Joining the union meant the loss of the servant. I am of the opinion that it is also entitled to this relief. It is the complainant's legal right to hire men unaffiliated with labor unions, and to make continuance of unaffiliation a condition of the employment. That is as assured to the employer as is the right of the unions to make it a condition of membership that their members shall not work in shops where non-union men are employed. And it is the master's legal right to have his servants abide with him, free from interference of the union, as it is the right of the union to prosper unmolested by the employer. The right of each to lawfully prosecute his affairs is equally within the protection of the law, and if in their competition for labor harm falls to one from the lawful promotion of the other's busi-ness, the injury is an inevitable incident, legitimately inflicted and excusable. So long as each keeps advancing his interest without purposely intending to harm the other, there is no room for complaint or cause for action, but when either converges the line of advance in assault upon the other, then the law, through its courts, calls a halt by injunction In other words, in their progress they must not step on the other's toes with intent to in-jure. Labor has not as yet appealed to the courts, but if the present "employer's closed shop" movement has for its ultimate object the overthrow and destruction of organized labor—an ulterior and unlawful object—and, by means as unworthy as those here reprehended, capital is certainly extending the invita-tion. The employer's complaint has been heard and vindicated by our highest tribunal. An issue in most respects like the one here presented was before the supreme court of the United States in *Hitchman Coal and Coke Co.* v. *Mitchell,* *245 U. S. 229.* The opinion of the court, delivered by Mr. Justice Pitney, is as in-

structive as it is compelling, and I quote from it liberally. The learned justice says (at *p. 251*) :

"This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment as the workingman is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power. *Adair* v. *United States, 208 U. S. 161, 174; Coppage* v. *Kansas, 236 U. S. 1, 14.* In the present case, needless to say, there is no act of legislation to which defendants may resort for justification.

"Plaintiff, having in the exercise of its undoubted rights established a working agreement between it and its employes, with the free assent of the latter, is entitled to be protected in the enjoyment of the resulting status, as in any other legal right. That the employment was 'at will,' and terminable by either party at any time, is of no consequence. In *Truax* v. *Raich, 239 U. S. 33, 38,* this court ruled upon the precise question as follows: 'It is said that the bill does not show an employment for a term, and that under an employment at will the complainant could be discharged at any time, for any reason or for no reason, the motive of the employer being immaterial. The conclusion, however, that is sought to be drawn is too broad. The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others. The employe has manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion, and, by the weight of authority, the unjustified interference of third persons is actionable, although the employment is at will.' (Citing many cases.) * * *

"Defendants set up, by way of justification or excuse. the right of workingmen to form unions, and to enlarge their membership by inviting other workingmen to join. . The right is freely conceded, provided the objects of the union be proper and legitimate, which we assume to be true, in a general sense, with respect to the union here in question. *Gompers* v. *Bucks Stove and Range Co., 221 U. S. 418, 439.* The cardinal error of defendants' position lies in the assumption that the right is so abso-

lute that it may be exercised under any circumstances and without any qualification; whereas, in truth, like other rights that exist in civilized society, it must always be exercised with reasonable regard for the conflicting rights of others.  *Brennan* v. *United Hatters*, *73 N. J. Law 729, 749.*  The familiar maxim, *Sic utere tuo ut alienum non lædas*, literally translated, 'So use your own property as not to injure that of another person,' but by more proper interpretation, 'so as not to injure the rights of another' (*Broom Leg. Max.* (*8th ed.*) *289*), applies to conflicting rights of every description.  For example, where two or more persons are entitled to use the same road or passage, each one in using it is under a duty to exercise care not to interfere with its use by the others, or to damage them while they are using it. And a most familiar application is the action for enticing an employe, in which it never was a justification that defendant wished to retain for himself the services of the employe.  *1 Black. Com. 429; 3 Id. 142.*

"Now, assuming defendants were exercising, through Hughes, the right to invite men to join their union, still they had plain notice that plaintiff's mine was run 'non-union,' that none of the men had a right to remain at work there after joining the union, and that the observance of this agreement was of great importance and value both to plaintiff and to its men who had voluntarily made the agreement and desired to continue working under it.  Yet defendants, far from exercising any care to refrain from unnecessarily injuring plaintiff, deliberately and advisedly selected that method of enlarging their membership which would inflict the greatest injury upon plaintiff and its loyal employes. Every Hitchman miner who joined Hughes' 'secret order,' and permitted his name to be entered upon Hughes' list, was guilty of a breach of his contract of employment and acted a lie whenever thereafter he entered plaintiff's mine to work.  Hughes not only connived at this, but must be deemed to have caused and procured it, for it was the main feature of defendants' plan, the *sine qua non* of their programme.  Evidently, it was deemed to be necessary, in order to 'organize the panhandle by a strike movement,' that at the Hitchman, for example, man after man should be persuaded to join the union, and having done so to

remain at work keeping the employer in ignorance of their number and identity, until so many had joined that by stopping work in a body they could coerce the employer and the remaining miners to 'organize the mine'—that is, to make an agreement that none but members of the union should be employed; that terms of employment should be determined by negotiation not with the employes but with union officers—perhaps, residents of other states and employes of competing mines—and that all questions in controversy between the mine operator and the miners should likewise be settled with outsiders."

Substituting Stevenson for Hughes, the opinion reads as if written for this case.

I will advise a decree.